```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
```

UNITED STATES OF AMERICA                              CRIMINAL ACTION

V.                                                    NO. 12-1

THOMAS HANKTON ET AL.                                 SECTION "F"

                           ORDER & REASONS

Before the Court is Thomas Hanktons' motion to suppress evidence and identifications. For the following reasons, the motion is DENIED.

**Background**

On June 19, 2014, a federal grand jury returned a third superseding indictment charging 13 defendants with 24 counts of federal crimes. The charges alleged in the indictment have been listed, summarized, and repeated throughout the procedural history of this case. This Order and Reasons assumes familiarity. This motion involves only one defendant, Thomas Hankton.

Hankton is charged in counts 1, 2, 3, 12, 13, 15, 16, 19, 20, and 23 of the indictment. The first three counts charge Hankton as a member of a RICO conspiracy, a drug conspiracy, and a conspiracy to possess firearms. In counts 12 and 13, he and Walter Porter are accused of murdering Hasan Williams in aid of the RICO conspiracy. Counts 15 and 16 charge him, with Telly Hankton and Walter Porter, for the attempted murder of John Matthews. In count 19, he is charged with conspiracy to commit misprision of a felony. Count 20

1

accuses him of being an accessory after the fact to the murder of Darnell Stewart. Finally, he is charged in count 23 as a member of a money laundering conspiracy.

In this motion, Thomas Hankton seeks to suppress an identification of him made by John Matthews on the ground of unreliable and suggestive procedures. Hankton also moves the Court to suppress evidence that was seized from his apartment pursuant to a search warrant obtained as a result of John Matthews' identification. Finally, Hankton moves to suppress certain evidence obtained from a storage unit because the search exceeded the scope of the warrant. The Court addresses each of Hankton's contentions in turn.

I. Identification by John Matthews

On October 24, 2010, John Matthews was shot at least seventeen times while inside of his home; he managed to survive. Mr. Matthews was taken to the hospital in critical condition. Desmond Pratt, a former New Orleans Police detective, was assigned to the case.[1] Pratt submitted a near 30-page police report detailing his investigation of the shooting. The investigation led to the arrest of Thomas Hankton.

According to Pratt's police report, in the weeks following the shooting, Pratt interviewed multiple witnesses in attempts to

---

[1] Pratt is no longer a detective for the NOPD. Rather, he is incarcerated for carnal knowledge and sexual battery.

develop a suspect for the shooting. Allegedly, several of those witnesses told Pratt that Matthews had been approached by Hankton family members who tried to bribe Matthews so he would not testify against Telly Hankton, Thomas Hankton's cousin, in a pending state court murder trial. (John Matthews was a witness to the Darnell Stewart homicide, which occurred outside of Matthews' daiquiri shop, and he was cooperating with investigators to identify Telly Hankton as the murderer).

Pratt also visited Matthews in the intensive care unit many times. According to Pratt's report, Matthews was able to "consistently describe[] the shooter who perpetrated the crime to be a light skin complexioned male, well dressed with a groomed mustache and presentably similar to the older father Hankton, which he knew from the community years back." Pratt claims that he learned through several sources, including an FBI informant, that John Matthews' shooter was Telly's cousin, "Tom," or "T." Pratt developed Thomas Hankton as a suspect.

On November 19, 2010, roughly a month after the shooting, Pratt and assistant district attorney Seth Shute went to the Trauma Center to interview Mr. Matthews. Matthews' medical condition was still severe, and he was heavily medicated. According to Pratt's report, Matthews recalled that, on the night of the shooting, he was returning home from his daiquiri shop when he noticed an SUV that was following him. When he arrived at his house, he rushed

3

inside and closed the door behind him. He then heard a "big boom" followed by several gunshots. Matthews observed a man near the opened front door who yelled profanity at him. Matthews managed to return fire. The shooter then fled. Mr. Matthews unequivocally confirmed this account in his impressive and forthright testimony at the suppression hearing.

Pratt reported that Matthews gave the following description of the shooter at the November 2010 interview:

> He was a nice looking young man about 27-33 years of age, well-built and well-dressed, well-manicured. He was light complexion with no facial hairs and well-trimmed, about six feet tall, 190lbs in weight. The perpetrator was clad in a beige colored club style suit.

Pratt then showed Matthews an array of six photographs, including a photograph of Thomas Hankton. Pratt's report indicates that Matthews pointed at two photos in the array and stated that both depicted men who resembled the shooter.[2] One of the photos was of Thomas Hankton. According to his report, Pratt ended the interview when he noticed that Matthews was "nodding in and out" due to pain medication. However, Seth Shute contradicted this statement at the hearing. According to Mr. Shute, Shute himself ended the interview when Pratt began to ask a potentially suggestive question. Shute testified that he stopped Pratt before Pratt could ask the question. Shute also testified that Mr. Matthews was unable to

---

[2] At the hearing, Mr. Matthews recalled selecting only one photo.

4

make a positive identification at the time, but that Matthews narrowed the six photos down to two.

Some two months later, on January 28, 2010, Pratt and Detective Jefferey Vappie, met again with John Matthews at a Starbucks in Gonzales, Louisiana. Pratt showed Matthews another array of six photographs, including, (as Pratt claimed in his report) a more current photo of Thomas Hankton. Pratt states in his report that he instructed Mr. Matthews to look at each photo carefully while "keeping a vivid image of the black male subject, with the well-groomed and neat appearance."[3] Matthews identified the photograph of Hankton as the shooter.

At the suppression hearing, Mr. Matthews recalled the second identification procedure at the Starbucks in Gonzales. He testified that his health had improved substantially from the November 2010 interview, and that he was no longer taking most of his medications. He remembered that the photographs from that array were in black and white. He testified that he requested to see the photos in color, but his request was unfulfilled.[4] Mr. Matthews testified adamantly that he picked out Thomas Hankton but wanted to make sure that he identified the correct person. He also repeated that he remembers vividly the man who was standing in his

---

[3] Mr. Matthews testified that he did not remember Pratt giving him this instruction. Neither did Detective Vappie.
[4] Detective Vappie testified at the hearing that he did not recall Mr. Matthews requesting color photos.

5

doorway on the night of the shooting. Mr. Matthews testified unequivocally that Pratt made no suggestion in any way as to which photo Matthews should select. Mr. Matthews stated that it was solely his decision to select Thomas Hankton's photo from the black-and-white photo lineup. Having observed Mr. Matthews, the Court finds his testimony credible.

A.

"The Due Process Clause protects against the use of evidence obtained from impermissibly suggestive identification procedures." United States v. Guidry, 406 F.3d 314, 319 (5th Cir. 2005). The Fifth Circuit instructs that the admissibility of identification evidence is governed by a two-step test: "First, we determine whether the identification procedure was impermissibly suggestive, and second, we ask whether the procedure posed a 'very substantial likelihood of irreparable misidentification.'" Id. (quoting United States v. Rogers, 126 F.3d 655, 658 (5th Cir. 1997). "Only when the trial court finds that the photographic spread was impermissibly suggestive is there any need for a determination of whether there was a very substantial likelihood of irreparable misidentification from the proffered witness at trial." United States v. Kimbrough, 481 F.2d 421, 425 (5th Cir. 1973). If the identification procedure was not impermissibly suggestive, the inquiry ends. See United States v. Honer, 225 F.3d 549, 553 (5th Cir. 2000).

6

If the procedure was impermissibly suggestive, the Court must determine "whether based on the totality of the circumstances, the [procedure] posed a very substantial likelihood of irreparable misidentification." Id. The Court must consider five factors to determine the likelihood of irreparable misidentification: 1) the witness's opportunity to view the perpetrator at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description; 4) the level of certainty demonstrated when making the identification; and 5) the time between the crime and the identification. Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

"It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." United States v. De la Fuente, 548 F.2d 528, 533 (5th Cir. 1977). However, the burden of persuasion shifts to the government: 1) to justify a warrantless arrest; 2) to prove the defendant voluntarily waived his privilege against self-incrimination; and 3) to prove that evidence was not tainted by an illegal wiretap. Id. Here, the burden of persuasion rests on the defendant.

Finally, the Court bears in mind that the Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of evidence, but by affording the defendant means to persuade the

7

jury that the evidence should be discounted as unworthy of credit." Perry v. New Hampshire, 132 S.Ct. 716, 723 (2012). "Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel, compulsory process, and confrontation plus cross-examination of witnesses." Id. (internal citations omitted).

B.

Although Thomas Hankton was the primary suspect in the NOPD investigation of the attempted murder of John Matthews, the government has not indicted Hankton as the alleged shooter. Rather, the government charges Walter Porter as the shooter. According to the government's theory, Thomas Hankton paid Walter Porter to commit the shooting at the behest of Telly Hankton.

Further, of concern here are serious allegations that Desmond Pratt, now a convicted felon, fabricated evidence and engaged in witness tampering. In a letter distributed to the defendants, the Assistant United States Attorney informed defense counsel that multiple alleged witnesses to the Jesse Reed homicide, when pressed by FBI agents and the prosecutor, admitted that they were coerced by Pratt to identify a particular person that Pratt pointed out. One "witness" admitted that "he was never on the scene of the Jesse Reed murder and was not a witness to it and that the entire story he told was provided to him by Detective Pratt." This, claims

Thomas Hankton, equates with proof that Pratt somehow coerced Matthews.

C.

The defendant bears the burden of proof to show that an identification procedure was impermissibly suggestive. Here, Hankton relies solely on an inference of impermissible suggestiveness due to allegations of Pratt's misconduct in a different investigation. Direct testimony from Mr. Matthews, an uninterested and credible witness, however, betrays that inference. Mr. Matthews recalled clearly the second identification procedure at the Starbucks in Gonzales. He testified candidly that he was not influenced by Pratt in selecting Thomas Hankton's photo. Detective Vappie, who was also present during the second identification procedure, corroborated Mr. Matthews' testimony. Detective Vappie testified that Pratt did not make any suggestion as to whom Mr. Matthews should select. Vappie agreed that Mr. Matthews identified Thomas Hankton on his own, without any outside influence.

   Pratt was also called at the hearing. He invoked his Fifth Amendment right against self-incrimination, refusing to answer even basic questions. Defense counsel argued that Pratt had waived his Fifth Amendment right by testifying in state court on similar topics and making statements regarding his conduct to federal government officials. Regarding the claim of Pratt's waiver of his

right against self-incrimination, the Court is fully aware of Pratt's so-called 30-page written statement and the FBI material counsel rely upon. This Court has the obligation to make credibility decisions about who testified and who made what statements. The Court assumes that Pratt indeed made the statements counsel point to.

The Court also observed the testimony and demeanor of John Matthews. Desmond Pratt is a convicted felon. A criminal cop. Pratt is unworthy of belief. Mr. Matthews, on the other hand, was direct and unshakeable in his testimony about how and why and whom he identified, Thomas Hankton. Although a shooting victim, he testified without venom, without any desire for revenge. Without argument or anger or resistance under cross examination. The Court was impressed by his openness and clarity. Defense counsel make something out of nothing. Mr. Matthews was clear and precise and honest. Defendant's waiver argument is rejected.

John Matthews' direct testimony trumps any inferences of Pratt's misconduct relied upon by the defendant. Hankton has failed to meet his burden of proof. The Court finds that the identification procedure was not impermissibly suggestive. Thus, the constitutional inquiry ends. See United States v. Honer, 225 F.3d 549, 553 (5th Cir. 2000). Thomas Hankton's motion to suppress the identification made by John Matthews is denied.

II. The Resulting Search Warrant

After Mr. Matthews identified Thomas Hankton as the shooter in the second photo array, Pratt contacted Hankton's parole officer, Che Troquille.[5] Troquille gave Hankton's address and other information to Pratt. Based on Mr. Matthews' identification, Pratt obtained an arrest warrant for Hankton on charges of attempted first degree murder. Two units were dispatched to arrest Hankton: one unit went to Hankton's apartment and the other went to Hankton's place of business. Pratt and Troquille accompanied the unit that went to Hankton's apartment. No one was in the apartment when the officers arrived.

While Troquille and Detective Jeffrey Vappie secured the apartment, Pratt obtained a search warrant. Pratt returned with the warrant and executed a search of Hankton's apartment. During the search, Troquille found a Taurus model PT 140, 40 caliber handgun wrapped in a towel near the washing machine. The officers confiscated $3,900 that was hidden inside a pillow, two cellular phones, an identification, a laptop computer, a pair of boots, a money counting machine,[6] and other miscellaneous papers and documents. Meanwhile, the unit that was dispatched to Hankton's place of business found Hankton there and arrested him.

---

[5] Hankton pled guilty to state charges for possession of cocaine in 2000. He was sentenced to 20 years imprisonment, but he was released on parole in 2008 by the state authorities.
[6] The government concedes that the money counting machine was found in Hankton's detached garage unit. Whether officers impermissibly searched Hankton's garage unit is addressed in Part III below.

11

A.

Hankton contends that because the search warrants were obtained as a result of an impermissibly suggestive identification procedure, the warrants were invalid and the evidence obtained from the searches should be suppressed. Because the Court finds that the identification procedure was not impermissibly suggestive, Hankton's contentions are baseless. Accordingly, Hankton's motion to suppress the evidence obtained by the search of his apartment is denied.

III. Hankton's Parolee Status

Desmond Pratt's handwritten field notes from his search of Hankton's property indicate that the money counting machine seized during the search was found in a detached garage unit. Hankton points out that the search warrant only authorized a search of his apartment, 3718 Loyola Drive, Apartment 129. The property was described in the warrant as "a multi-story apartment complex with a greenish and purple colored vinyl siding with a green front door facing easterly. The number 3718 are affixed to the building on the east side of the building. The front door of the apartment has a brass doorknocker with the number '129' engraved on it." Because the detached garage unit was not included in the warrant, Hankton contends, the officers exceeded the scope of the warrant by searching the detached garage.

A.

Hankton was on parole at the time of the searches of his apartment and detached garage. As a condition of his parole, Hankton's parole officer was allowed to search, even without a warrant, his person, property, or residence on reasonable suspicion that Hankton was engaged in criminal activity. See La. R.S. 15:574.4.2 ("The [parole] committee may also require . . . that the [parolee] conform to any of the following conditions . . . searches of person, property, residence, or vehicle, when reasonable suspicion exists that criminal activity has been engaged in while on parole."). Hankton admits that he was subject to this condition.

The United States Supreme Court has consistently upheld state statutes that allow a less-than-probable-cause standard to search a paroloee's property without a warrant. In United States v. Knights, 534 U.S. 112 (2001), the Supreme Court upheld a state statute that allowed warrantless, non-consensual searches of a probationer's apartment based on reasonable suspicion that the probationer was engaged in criminal conduct. In Knights, a condition of the defendant's probation was that he submit his "person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." Id. at 114. Finding that the probation condition significantly diminished the defendant's reasonable

13

expectation of privacy, the Court balanced the state's interests in administering its probation laws against the probationer's Fourth Amendment rights. The Court reasoned, "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." Id. at 121.

The Supreme Court also reached the same conclusion in Griffin v. Wisconsin, 483 U.S. 868 (1987). In Griffin, the Court held that a probation officer's warrantless, non-consensual search of a probationer's apartment pursuant to a probation condition did not violate the Fourth Amendment. There, a Wisconsin regulation permitted "any probation officer to search a probationer's home without a warrant as along as his supervisor approves and as long as there are 'reasonable grounds' to believe the presence of contraband—including any item the probationer cannot possess under the probation conditions." Id. at 871-72. The probation supervisor received information from detectives that there may have been guns in the defendant's apartment. The supervisor, accompanied by another probation officer and three plainclothes policemen, went to the defendant's apartment and conducted a warrantless search. The officers found a handgun in the apartment.

The Court in <u>Griffin</u> found that the search did not violate the Fourth Amendment because it was carried out pursuant to a regulation (i.e., the state's probation regulation) that itself satisfied the reasonableness requirement under the Fourth Amendment. The Court reasoned, "A warrant requirement would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires. Moreover, the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct." <u>Id.</u> 876. Accordingly, the High Court concluded that the search of the probationer's residence "was 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." <u>Id.</u> at 880. The same reasoning applies here.

Hankton's parole condition has no material difference from those imposed in <u>Knights</u> and <u>Griffin</u>. Che Troquille, Hankton's parole officer, testified at the hearing that he accompanied Pratt and the other officers in executing both the arrest warrant and the search warrant of Hankton's apartment. He confirmed that the money counting machine was found in a detached garage near Hankton's apartment. Troquille believed he was exercising his authority to search the detached garage pursuant to Hankton's

parole condition. Officer Troquille's authority to do so is informed by Knights and Griffin.

John Matthews' positive identification of Thomas Hankton as his shooter gave Officer Troquille ample cause for reasonable suspicion that Hankton was engaged in criminal activity. Thus, even absent a search warrant, there were no constitutional violations by searching Hankton's apartment or detached garage.

Accordingly, IT IS ORDERED that Thomas Hankton's motion to suppress evidence and identifications is DENIED.

                        New Orleans, Louisiana, March 9, 2016

                            _____
                                MARTIN L. C. FELDMAN
                            UNITED STATES DISTRICT JUDGE